# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Preston Klopferstein,

      Plaintiff,                                     Case No. 3:16CV2193

     v.                                          **ORDER**

Taylor University, *et al.*,

      Defendants.

In this Title IX suit, plaintiff seeks damages against defendant Taylor University ("Taylor" or the "University") for its response to his sexual assault complaint against a fellow student. *See* 20 U.S.C. § 1681(a). Pending is defendant Taylor's motion for summary judgment. (Doc. 27).

For the reasons that follow, I grant the motion.

## Background

Former individual defendant Cameron Glass[1] was plaintiff Preston Klopferstein's roommate for the 2015-16 academic year. On or about August 31, 2015, shortly after plaintiff returned to the University for the Fall, Glass began sex-related acts of harassment, including frequent nudity, unwanted touching, including of plaintiff's genitals, urination on plaintiff's bed, and similarly hostile conduct, including a threat to kill plaintiff if he disclosed the misconduct.

On September 4, 2015, Glass's offensive behavior culminated in an attempt to sodomize plaintiff. At 11:00 p.m. that night, plaintiff notified his residence hall's director, Tyler Witzig,

---

[1] I previously granted Glass's unopposed motion for dismissal from the case. (Doc. 14).

about his roommate's actions. That night, the University placed plaintiff in other accommodations, and he and Glass remained apart for the remainder of plaintiff's enrollment, which ended on or about September 21, 2015, when plaintiff withdrew from the University.

Because the Friday on which plaintiff first informed Witzig about Glass's activities was the eve of the Labor Day weekend, the University did nothing further in response until Tuesday, September 8, when plaintiff met with several University officials, including the Dean of Students.

The Dean wrote Glass on September 10, informing him that the University was investigating allegations that he may have engaged in acts of serious misconduct. Plaintiff filed a Title IX complaint on September 11. [2]

The University then undertook an investigation. A Title IX hearing ensued and culminated in Glass's dismissal on October 6, 2015.

After plaintiff had left Taylor, the University reevaluated its decision to dismiss Glass. Prompted by his parents,[3] and in light of medical documentation that they provided, the University determined that Glass's behavior resulted, at least in part, from Tourette's syndrome and obsessive compulsive disorder. On the basis of that determination and institution of remedial measures, it allowed Glass to re-enroll.[4]

---

[2] Shortly after learning of the plaintiff's contentions, the University instructed Glass to have no contact with the plaintiff. Aside from one coincidental encounter in a dining hall, Glass abided by that directive.

[3] Taylor does not dispute plaintiff's claim that Glass's parents are its alumni and have supported it financially, or that Glass's father was in incumbent Trustee. The University disputes, however, that those factors influenced its later decision to reinstate Glass.

[4] There is no indication that the University's readmission of Glass influenced plaintiff's decision to withdraw from classes. Indeed, given the timing, it could not have–plaintiff withdrew on September 21, 2015, and Taylor did not readmit Glass until October 28, 2015.

In support of his claim for relief, plaintiff contends that during the prior academic year, Glass had engaged in sexual harassment and been the subject of a Title IX complaint. The uncontested record shows that this contention is partially true: Glass had engaged in sexually suggestive behavior toward a female non-student housekeeper, "embrac[ing]" her and making "kissing faces" at her. (Doc. 38-2, ID 694). Though she had not reported the incident, a colleague had.

Though the housekeeper was not covered by Title IX (so that no Title IX complaint or proceedings occurred relative to Glass's misconduct), the University conducted a follow-up inquiry on learning about the incident. The housekeeper indicated that she did not want Glass to get into trouble, as he was her friend. The University counseled Glass and told him further similar acts would result in his dismissal.

The uncontested record also shows that plaintiff and Glass had become acquainted during the prior academic year, when plaintiff, then a freshman, and Glass, then a sophomore, lived in the same dormitory. Plaintiff testified that during that year, he became aware of various acts and activities by Glass, including seeing Glass streak naked through the dorm lobby, seeing "Vine videos" Glass had posted online, in which Glass "made it look like . . . he killed someone" in an elevator, or shouted "penis, penis" on a crowded air plane,[5] and seeing on another student's cell phone videos of Glass "with other guys naked and some girls naked and just doing all kinds of raunchy and inappropriate stuff in the dorm room." (Doc. 26, ID 161-63).

No one, including plaintiff, reported any of those activities to the University.

---

[5] Plaintiff faults Taylor for not having undertaken to become aware, before it placed him and Glass together as roommates, of the "Vine videos." He points, however, to no prior notice that the University had before September 4, 2015, that such videos existed. Nor does he cite case law to the effect that, following the incident with the housekeeper, the University had any duty under Title IX law to search Glass's social media presence in an effort to find the videos.

Despite having observed this conduct by Glass, plaintiff agreed to room with him for the 2015-16 academic year. The University acquiesced in their decision.

**Discussion**

To prevail on a Title IX student-on-student sexual harassment claim, plaintiff must prove: (1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived him of access to the University's educational opportunities or benefits; (2) the University had actual knowledge of the sexual harassment; and, (3) the University was deliberately indifferent to the harassment. *E.g.*, *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 258–59 (6th Cir. 2000) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)).

Viewing the record most favorably for the plaintiff, I conclude that no rational jury could find that Taylor: (1) had notice that Glass might engage in sexual harassment of the plaintiff; (2) acted indifferently, much less deliberately so, once it learned that Glass had sexually harassed the plaintiff; or (3) in any way deprived plaintiff of his right to full enjoyment of the benefits of his rights under Title IX.

### 1. The University Did Not Have Actual Notice

In *Hart v. Paint Valley Local School Dist.*, 2002 WL 31951264, *6 (S.D. Ohio 2002), the court defined what constitutes "actual notice" in the Title IX context:

> the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to children in the school based on prior complaint of other students. While the complaints may be unsubstantiated by corroborating evidence and denied by the alleged[] offend[er], whether such complaints put the school district on notice of a substantial risk to students . . . is usually a question for the jury.

*See also Adams v. Ohio Univ.*, 300 F. Supp.3d 983, 995–96 (S.D. Ohio 2018) (citing *Hart*, applying the same actual notice standard to university officials).

Of course, plaintiff can only reach a jury if he presents evidence of notice "such that a reasonable jury could return a verdict" for him as "the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, plaintiff has failed to meet that standard.

Glass's interaction with the housekeeper was not a Title IX-covered incident, as it did not involve a student. Moreover, the object of Glass's sexually suggestive misbehavior was a female, not a fellow male student.[6] The person subjected to that misconduct did not believe any response was necessary, or want any such action taken because she did not want anything to affect her friendship with Glass.

Nothing about that incident could have alerted or did alert the University that plaintiff, or any other student, was at risk of similar, or more aggressive misconduct on Glass's part. Nonetheless, Taylor affirmatively took responsive action by warning Glass about the consequences of similar acts in the future. Between then and plaintiff's report at 11:00 p.m. on September 4, 2015, it had no reason to believe, much less actually know, that Glass presented a risk of harm to plaintiff or anyone else.

Indeed, if anyone related to this case had notice that something about Glass was seriously off kilter, it was plaintiff himself. He had witnessed Glass running naked in the dorm common area and viewed videos that should have alerted a rational college student that Glass (and others) might engage in activity that contravened the school's conduct standards.

---

[6] I note that in some instances, misconduct toward a staff member could, depending on its nature, put a university on notice for Title IX purposes–provided that the circumstances of the past harassment bear some similarity to the complainant's allegations. *See Adams*, *supra*, 300 F. Supp.3d at 997 ("The mere fact that Professor Escobedo's previous victims were not students is not enough to save the University from liability. In fact . . . these facts . . . reveal[] a pattern of preying on young women in the English Department," where both the previous victims, and the student plaintiffs, were in positions subordinate to the harassing professor). Claims of past misconduct "that were very different than the plaintiff's allegations" do not suffice. *Id.* at 998.

5

But not only did plaintiff not report what he had witnessed and seen; he befriended Glass and agreed to be his roommate. Thus he cannot fault the University for its lack of awareness of the risk that he might encounter, and be subject to overtly hostile and aggressive sexual acts by Glass.[7]

Defendant is entitled to summary judgment on the basis that it had no notice that plaintiff was at risk of sexual harassment by Glass.

## 2. The University's Response Was Adequate

In *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274 (1998), the Supreme Court held that, before a student could recover damages for a teacher's sexual harassment, the student had to establish that an "official of the school district who at a minimum ha[d] the authority to institute corrective measures on the district's behalf ha[d] actual notice of, and [was] deliberately indifferent to, the teacher's misconduct." *Id.* at 277. The same deliberate indifference standard applies in the case of student-on-student harassment. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999).

The deliberate indifference standard is rigorous. It does not require recipients of federal funding to "purge their schools of actionable peer harassment," or issue "'particular disciplinary action' to avoid Title IX liability." *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016) (citation omitted). Nor does it afford student victims "a right to 'make particular remedial demands'" of the institution when it comes to discipline. *Id.* (citation omitted). Rather, an institution is deliberately indifferent to violations of a student's right to a safe learning

---

[7] This is not to say that the defendant could assert an assumption of the risk defense. *Cf. Williams v. General Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) (observing, in the Title VII context, that "judgments by the court as to a woman's assumption of risk upon entering a hostile [workplace] environment are improper").

environment only when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, *supra*, 526 U.S. at 648–49.

Given the slight prior notice, even if a jury could find that it sufficed to alert Taylor about Glass's proclivities (which it did not), the issue here is whether, once plaintiff told the residence hall director what he had endured, the University's response going forward appropriately protected plaintiff from the risk of repeated misconduct.

No rational jury could find that Taylor's response, once it learned what Glass had done, was inadequate. It immediately separated plaintiff from Glass, and made arrangements for them no longer to room together. It undertook Title IX proceedings upon plaintiff's complaint. It expelled Glass.

Plaintiff meanwhile withdrew of his own accord, even though the University had taken those steps that the law deems sufficient, and had done so swiftly, in response to plaintiff's report of September 4, 2015. At the time plaintiff did so, he could not have reasonably felt any apprehension that Glass would or could continue harassing him.

In sum, rather than failing to respond, or otherwise manifesting indifference to plaintiff's situation, the University did all it could to immediately and then permanently keep Glass apart from and away from the plaintiff. Defendant is, accordingly, entitled to summary judgment on the issue of the sufficiency of its response once it learned of the harassment.

### 3. The University Did Not Deprive The Plaintiff Of Any Educational Benefits

Once the University had acted to remove the risk of future harassment, it had done all that it could have done, and, certainly all the law required it to do, to ensure plaintiff's future enjoyment of its educational offerings. Though the trauma plaintiff endured before he notified

the University about Glass's conduct may have prompted his withdrawal, nothing about the circumstances as they then existed caused, much less compelled him to leave.

To the extent that plaintiff might argue–which he has not–that his departure was the Title IX equivalent of a constructive discharge in a Title VII hostile work environment situation, he could not prevail. *See Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25, 30 (4th Cir. 2001) ("Alex's constructive expulsion argument is a novel theory that has not yet been accepted by any court."); *see also Buescher v. Baldwin Wallace Univ.*, 86 F. Supp.3d 789, 807 (N.D. Ohio 2015) (plaintiffs who withdrew from nursing program failed to "demonstrate that a cause of action for constructive dismissal exists outside the employment context").

The Sixth Circuit has summarized the elements of a constructive discharge claim under Title VII: "To demonstrate a constructive discharge, [the plaintiff] must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727–28 (6th Cir. 2014). By analogy, to prevail on a claim that the University's response to his complaint was so inadequate that he was forced to leave or risk repeated harassment, plaintiff would have to show that: 1) the University's response was so deliberately indifferent to the risk of repetition that any reasonable student would find the situation intolerable; and 2) the University intended to force him to withdraw.

No such situation existed here once the University, on being made aware of Glass's conduct, had immediately removed plaintiff from any risk of harm, and then eliminated any such risk altogether by expelling Glass.

The fact that Taylor readmitted Glass after plaintiff had withdrawn is immaterial. When plaintiff left he could not have known that that would occur. Moreover, once the University was

8

aware of Glass's conditions, it had to consider whether expulsion was still the proper response in light of Glass's rights as a potentially disabled student, "and it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Davis*, *supra*, 526 U.S. at 649.

Even if the University had not expelled Glass and issued a lesser punishment, plaintiff's case for liability would not be air tight. *See Stiles*, *supra*, 819 F.3d at 848 ("courts should avoid second-guessing school administrators' disciplinary decisions"). So far as it was aware, Taylor had resolved the situation by providing separate living quarters for the plaintiff and instructing Glass to refrain from all further contact with him. To be sure, had Glass disregarded that mandate, and engaged in further harassment, a question might then arise as to whether, in hindsight, the University's response had been adequate.

But that, obviously, is not this case.

Glass undoubtedly interfered with plaintiff's right to a harassment-free educational setting. But he can hold Taylor liable for that injury only if the University "itself . . . 'exclud[ed] [plaintiff] from participation in,'" or denied him "'the benefits of . . . its programs and activities,'"–that is, only for its "*own* decision to remain idle in the face of known student-on-student harassment." *Davis*, *supra*, 526 U.S. at 640–41 (quoting in part 20 U.S.C. § 1682 (brackets and alterations omitted)). And in this case, once plaintiff put defendant on notice of the harassment, Taylor did not remain idle.

To the extent that Glass's sexual harassment motivated plaintiff's loss of his right to enjoy fully the educational benefits the University offered, that is due to what he did in response to Glass's harassment, not what the University failed to do on his behalf.

The University is entitled to summary judgment on plaintiff's claim that it denied him the right to enjoy the benefits that Title IX ensures.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT defendant Taylor University's motion for summary judgment (Doc. 27) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge